PRESENT:  All the Justices

JUNE HAYNES-GARRETT

v.  Record No. 171055

DREW A. DUNN, ET AL.

OPINION BY
JUSTICE ELIZABETH A. McCLANAHAN
October 4, 2018

FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
A. Bonwill Shockley, Judge

June Haynes-Garrett ("Haynes-Garrett") appeals from the judgment of the circuit court

striking her evidence at the trial of her personal injury action against Drew and Cynthia Dunn

(the "Dunns") and Sandbridge Properties, Inc., d/b/a Siebert Realty ("Siebert").  Haynes-Garrett

argues that the circuit court erred in ruling that the defendants only owed her the duty of care that

a landlord owes its tenant when she rented the Dunns' vacation rental house for her family's one-

week vacation at Virginia Beach.  We affirm the judgment of the circuit court.

## I.  BACKGROUND

### A.  Complaint

Haynes-Garrett filed a complaint against the Dunns and Siebert alleging that the Dunns

"owned, controlled, operated and/or managed a rental house located at 3601 Sandpiper Road," in

Virginia Beach and that Siebert "controlled, operated and/or managed the house for and on

behalf of the Dunns, including, but not limited to, renting the house on behalf of the Dunns to

week long vacationers."  According to her complaint, she "entered into a rental agreement with

the Dunns, through [Siebert], to rent the house, for valuable consideration, for one week."

Haynes-Garrett alleges that when she "arrived at the house for the first time" at "the start

of [her] one week rental period," she "walked from a carpeted room into an adjoining tiled

hallway" and "a lip or rise created by the unevenness of the threshold between the carpeted room

flooring and the tiled hallway flooring . . . caused [her] to fall to the ground and sustain serious injuries." She contends that the Dunns and Siebert were negligent because they "failed to maintain the house's floors in a safe and fit condition," "failed to make reasonable inspection of the house's floors," and "failed to warn [her] of the hidden, dangerous and hazardous condition that caused her fall."

B. Evidence at Trial

"When ruling on a motion to strike the plaintiff's evidence, the circuit court must 'accept as true all the evidence favorable to the plaintiff as well as any reasonable inference a jury might draw therefrom which would sustain the plaintiff's cause of action.'" *Gelber v. Glock*, 293 Va. 497, 514 (2017) (quoting *Austin v. Shoney's, Inc.*, 254 Va. 134, 138, (1997)). Thus, "[w]hen reviewing a circuit court's decision granting a motion to strike the plaintiff's evidence, we likewise review the evidence in the light most favorable to the plaintiff." *Id.* at 514-15.

1. The Rental House

The Dunns, who reside in Northern Virginia, purchased the rental house, referred to as "Dolphin's Paradise," in 2004, to serve as a "multipurpose second house" for them "to spend some time with family in Virginia Beach," as "an investment for [their] future, and, eventually, [their] retirement home." It is a single-family, two-level beach house with seven bedrooms, four bathrooms, two family rooms, a dining area, and kitchen. The Dunns rent the house from May through October. Mr. Dunn testified that the house is only rented to "families" and is not "a party house for kids from college."

The rental of Dolphin's Paradise is managed by Siebert, which has an office located approximately three or four miles from the rental house. Pursuant to the management agreement, the Dunns appoint Siebert "as their sole and exclusive agent to rent and manage the property, and

to enter into lease/contracts with Tenant(s)/Guest(s)."  The agreement provides that Siebert will send the Dunns an "annual addendum reflecting [Siebert's] rate recommendations" and be granted "the exclusive right to rent and manage the property for the rental rate agreed to on the addendum or such rental rate or terms as may hereafter be agreed upon."

The management agreement requires the Dunns to "provide a minimum of 8 weeks during the In/Peak Seasons for the purpose of rentals" and authorizes Siebert to "collect all rents and deposits in connection with the rental of the Property."  The agreement provides for a "monthly Winter Rental," at the option of the Dunns, upon various terms and conditions.

The agreement states that Siebert will require payment of security deposits by occupants "for the protection of the property and to assist in repairs when necessary."  In particular, occupants are charged, "on all weekly and short stays less than 21 days, a fee for an accidental damage protection program which protects the property."  A security deposit of $500 is collected "for all rentals in excess of 21 days and less than 90 days, and no less than one month's rent on longer stays in excess of 90 days."  "Any security deposit not withheld for damage must be returned to the Guest within 45 days after the end of lease."

Pursuant to the agreement, when Dolphin's Paradise is occupied by a guest, the Dunns are not permitted to "enter the Property or instruct any other person to enter the Property without prior notification to [Siebert]."  The agreement provides that a "standard General Cleaning" will be performed "between Guests for weekly or short stay reservations" and a "Deep Cleaning" will be conducted, at a minimum, once a year.  Mrs. Dunn routinely spends a week at Dolphin's Paradise in the spring to prepare the house for the leasing season and Mr. Dunn generally spends a week vacationing there following the end of the leasing season.

3

Dolphin's Paradise is furnished with beds, other furniture, appliances, and utility services, all of which is considered part of the "rental." Siebert also provides the linens and towels. The Dunns, who live in Northern Virginia, are not present at Dolphin's Paradise when it is rented. They provide no food service, room service, daily maid service or security personnel for Dolphin's Paradise.

2. Haynes-Garrett's Rental of Dolphin's Paradise and the Accident

Haynes-Garrett testified that her extended family has "a tradition of getting together for a week every summer." In November 2013, her daughter, Beth Acord, conducted online computer research to locate vacation rentals that would accommodate their family. Based on that research, Mrs. Haynes-Garrett chose Dolphin's Paradise for her family's 2014 summer vacation. Haynes-Garrett sent a check to Siebert for payment of the rental fee but did not speak directly with any representative from Siebert. She also did not meet the Dunns or have any communication with them before she rented their home. She testified that she did not sign the rental agreement with Siebert, but believed that Acord signed the agreement.

On the day the accident occurred, Haynes-Garrett's grandson, Ben Fabian, along with his wife and children, were the first members of the family to arrive at Dolphin's Paradise. Fabian's family went "to the realty office, picked up the packet that had the keys and instructions, and then . . . drove back to the property." The Fabians brought in the linens which were provided by Siebert and contained in "tubs."

When Haynes-Garrett and her husband arrived to Dolphin's Paradise, Fabian and his wife were in a bedroom they selected for their family. Haynes-Garrett entered through the front door and walked up the inside steps. She walked around the kitchen, went into the family room, and then walked into the master bedroom. Fabian called out to her from the bedroom he and his wife

4

had selected, and Haynes-Garrett proceeded to walk on the carpeted floor from the master bedroom, across the family room, toward a ceramic tiled hallway outside the room where Fabian was located. As Haynes-Garrett walked from the carpeted area to the tiled hallway, she stubbed her toe on the transition strip or "lip" where the floor was raised. When she stubbed her toe, she fell onto the ceramic tile floor, injuring her elbow, which subsequently required two surgeries.

C. Motion to Strike

At the conclusion of Haynes-Garrett's evidence, the defendants moved to strike her evidence and enter judgment for defendants.

1. The Dunns

The Dunns asserted that the evidence failed to prove a breach of any duty they owed to Haynes-Garrett. Specifically, they argued that where "possession of the premises are surrendered to even a short-term vacation rental, such as a one-week rental," the relationship of the owner and guest is one of landlord and tenant. The Dunns explained that neither they nor their agent, Siebert, "maintained a presence on the property, or were in direct or continued control of the property during the time that Mrs. Haynes-Garrett rented it." Therefore, according to the Dunns, they only owed Haynes-Garrett the duty of care that a landlord owes its tenant.

The Dunns asserted that as landlords, in the absence of fraud or concealment, they owed no duty of care to maintain or repair the premises and no duty to warn of a dangerous condition on the premises unless they knew of a dangerous condition that was not open and obvious or discoverable by Haynes-Garrett upon making a reasonable inspection. The Dunns further argued that, assuming the "lip" on which Haynes-Garrett tripped was a dangerous condition, it was open and obvious, and discoverable by making a reasonable inspection. Therefore, according to the Dunns, the evidence proved no breach of duty owed by them to Haynes-Garrett.

In response to the Dunns' motion to strike, Haynes-Garrett asserted that the Dunns owed her the same duty that an innkeeper owes its guest. Haynes-Garrett argued that "[t]he house is turnkey" and "everything is provided" as with a hotel or bed and breakfast, such that the only difference between a hotel and Dolphin's Paradise is the "type of physical structure." Haynes-Garret also argued that "if the relationship is not one of innkeeper and guest, at a minimum, it is one of owner/invitee." Haynes-Garrett further argued that because the "lip" is "short" and "appears identical to the flat surface of the tiled foyer flooring," it is not open and obvious.

2. Siebert

In support of its motion to strike, Siebert asserted that it had no relationship with Haynes-Garrett and owed no duty of care to her with regard to the condition of Dolphin's Paradise. More specifically, Siebert argued that it was "not a landlord," "didn't own the property," and "had a property management agreement with the Dunns that governs [Siebert's] . . . contractual obligations with the Dunns." Thus, according to Siebert, it "assume[d] no duty to Mrs. Haynes-Garrett with regard to the condition of the property" and "the law [did] not impose upon Siebert Realty any duty regarding the condition of the property." Haynes-Garrett responded that Siebert owed "a duty to the people who come within its sphere of conduct" and also a duty of care as part of a "joint endeavor" with the Dunns.

The circuit court granted the defendants' motions to strike on the grounds they argued and entered judgment in their favor.

II. ISSUE ON APPEAL

Haynes-Garrett's assignment of error is limited to the issue of whether the circuit court "erred in granting the defendants' motion to strike at the end of Mrs. Haynes-Garrett's evidence

6

*on the grounds the defendants only owed Mrs. Haynes-Garrett a duty of care commensurate with that of landlord and tenant.*" (Emphasis added.)

Siebert did not assert that it owed a duty of care commensurate with that of landlord and tenant. Rather, Siebert asserted that it owed *no* duty of care to Haynes-Garrett because it had no relationship with her. The circuit court sustained Siebert's motion to strike on the grounds it asserted. Therefore, the circuit court's ruling as to Siebert, that it owed no duty of care to Haynes-Garrett, is not before us on appeal.

The Dunns asserted that Haynes-Garrett's evidence established that they only owed a duty of care to Haynes-Garrett that a landlord owes its tenant and that they did not breach this duty. The circuit court sustained the Dunns' motion to strike on these grounds. Haynes-Garrett does not assign error to the circuit court's ruling that the Dunns did not breach their duty of care to her.

Accordingly, the sole issue before us on appeal is whether the circuit court erred in ruling that the Dunns only owed a duty of care to Haynes-Garrett commensurate with that of landlord and tenant.

## III. ANALYSIS

Haynes-Garrett contends that the Dunns owed her the elevated duty of care that an innkeeper owes its guest. We disagree and hold, under the evidence presented by Haynes-Garrett, that the Dunns only owed her the duty of care that a landlord owes its tenant.[1]

---

[1] Haynes-Garrett argues, alternatively, that the Dunns owed her a duty of care commensurate with the duty a property owner/occupant owes to its invitee. Haynes-Garrett was an *occupant* of the premises, and, therefore, could not also be an invitee. *See, e.g.*, *Bauer v. Harn*, 223 Va. 31, 36-37 (1982) (acknowledging that "[t]he term 'invitee' in tort law describes the status of a person entering land in respect to the duties owed him by [an] owner or occupier of [such] land," and distinguishing invitees from "landowner[s] or occupier[s]"). The issue for

7

Under the common law, a landlord has "no duty to maintain in a safe condition any part of the leased premises that [is] under [a tenant's] exclusive control." *Isbell v. Commercial Inv. Assocs.*, 273 Va. 605, 611 (2007) (citation omitted). "Where the right of possession and enjoyment of the leased premises passes to the lessee . . ., in the absence of concealment or fraud by the landlord as to some defect in the premises, known to him and unknown to the tenant, the tenant takes the premises in whatever condition they may be in, thus assuming all risk of personal injury from defects therein." *Id.*[2]

In contrast, "an elevated duty of care" is imposed upon a property owner that operates an inn on its premises. "An innkeeper holds out his house as a public place" as an "accommodation for travelers." *Alpaugh v. Wolverton*, 184 Va. 943, 947 (1946). *See also* Black's Law Dictionary at 792 (7th ed. 1999) (defining an "innkeeper" as "[a] person who, for compensation, keeps open a public house for the lodging and entertainment of travelers"). When the relationship is that of innkeeper and guest, "[t]he responsibility for the premises is primarily on the innkeeper, and the guests may generally assume that they are safe." *Kirby v. Moehlman*, 182 Va. 876, 884 (1944) (citation omitted). Thus, the innkeeper owes a duty "to take every

---

our determination is whether she occupied the premises as the guest of an innkeeper or the tenant of a landlord.

[2] Although Haynes-Garrett testified that her daughter may have signed the rental agreement, Haynes-Garrett asserted in her complaint that it was she who "entered into a rental agreement with the Dunns, through [Siebert], to rent the house, for valuable consideration, for one week." Thus, the issue in this case as made by the pleadings is whether the rental agreement gave rise to a duty on the part of the Dunns to maintain the premises in a safe condition as she alleged in her complaint. *See Dabney v. Augusta Mut. Ins. Co.,* 282 Va. 78, 86 (2011) (noting that "[t]he issues in a case are made by the pleadings, and not by the testimony of witnesses or other evidence") (citation omitted). In any event, regardless of who signed the rental agreement, the duties and liabilities of a landlord to invitees and guests of its tenant, with respect to personal injuries, are ordinarily the same as those of the landlord to its tenant since invitees and guests "stand in the tenant's shoes." *Oliver v. Cashin*, 192 Va. 540, 543 (1951).

reasonable precaution to protect the person and property of their guests and boarders."

*Crosswhite v. Shelby Operating Corp.*, 182 Va. 713, 716 (1944).

The distinction between the landlord-tenant relationship and the innkeeper-guest relationship is based upon the extent to which the owner of the premises maintains possession of and control over the premises during its occupancy. "[U]nlike a landlord, an innkeeper is in direct and continued control of the property and usually maintains a presence on the property personally or through agents." *Taboada v. Daly Seven, Inc.*, 271 Va. 313, 324 (2006). The innkeeper's continued presence on and control over the property during the guest's occupation justifies the elevated duty of care owed by an innkeeper to its guest just as a common carrier's continued presence on and control over its vehicle justifies the elevated duty owed by a common carrier to its passengers. *See id.* at 325. On the other hand, a lessee enjoys "the right of possession and enjoyment of the leased premises" and, therefore, "assum[es] all risk of personal injury from defects therein." *Isbell*, 273 Va. at 611. "[T]he controlling factor in determining whether the relationship of innkeeper and guest has been established is the intent of the parties." *Alpaugh*, 184 Va. at 949.[3]

---

[3] Haynes-Garrett relies on *Jarmak v. Ramos*, Case No. 6:10-cv-00048, 2011 U.S. Dist. LEXIS 75304 (W.D. Va. July 13, 2011) (unpublished), wherein the court ruled that an innkeeper-guest relationship was established because the owner of a cabin "intended for the cabin to be used for short stays by visitors attracted to a scenic area of Virginia, and that [plaintiff] intended to use the cabin for those purposes." *Id.* at *15. The court in *Jarmak* focused on factors supporting an intention "to accommodate travelers for brief stays," such as the advertisement of the cabin as a "fully equipped place to stay," as "non-smoking," as being located "near attractions that would typically interest travelers," and the use of a "daily or weekly rate pricing structure." *Id.* at *13-14. On appeal, neither of the litigants contested the district court's conclusion that an innkeeper-guest relationship had been established, and accordingly, the United States Court of Appeals for the Fourth Circuit accepted this ruling as controlling for purposes of the appeal, without subjecting it to inquiry. *Jarmak v. Ramos*, 497 Fed. Appx. 289, 292, 295 (4th Cir. 2012) (vacating summary judgment in defendant's favor and remanding for further proceedings). The proper inquiry, however, is not whether the parties intended a short-

Applying these principles, we agree with the circuit court that Haynes-Garrett did not establish a relationship of innkeeper and guest. As an initial matter, the Dunns did not hold Dolphin's Paradise out as a "public place" for "the accommodation for travelers." *Id.* at 947. Dolphin's Paradise was used by the Dunns as a "second house" to "spend time with family" during certain times of the year and was available for rental only during the months of May through October. Furthermore, the Dunns did not make Dolphin's Paradise available to the "public" generally, based solely on the requirement that their stated rental price be paid, but rented their vacation house only to "families." Thus, the Dunns cannot be characterized as "innkeepers" in the traditional sense. [4]

Furthermore, the evidence shows that the parties did not intend for the Dunns, or their agent, Siebert, to maintain possession and control of Dolphin's Paradise during the occupancy by Haynes-Garrett and her family. [5] The Dunns, who live in Northern Virginia, were not present at Dolphin's Paradise and, in fact, were not permitted to enter the premises without prior notification to Siebert, which is located three or four miles from Dolphin's Paradise. Cleaning of

_____

term stay, but whether parties to a short-term rental agreement intended that the occupants be entitled to exclusive possession and control of the premises during their stay.

[4] For example, Mr. Dunn's uncontradicted testimony that Dolphin's Paradise is subject to "restrictions [and] requirements on people that [it is] rent[ed] to," including that it is only rented to "families" and is not "a party house for kids from college," and that there is "a[ minimum] age requirement to rent it," establish that the house is readily distinguishable from the accommodations offered by innkeepers in these respects.

[5] Haynes-Garrett notes that the Virginia Residential Landlord Tenant Act ("VRLTA") excludes from its provisions an occupant in a vacation residential facility if the occupant "does not reside in such lodging as his primary residence." Code § 55-248.3:1(D)(1). Whether or not a landlord-tenant relationship exists under common law, however, is not dependent on whether an occupancy or tenancy is a residential tenancy subject to the rights and obligations of the VRLTA.

Dolphin's Paradise only took place between the periods of occupancy and security deposits were required from occupants for an accidental damage protection program to protect the property.[6] The fact that the Dunns provided no food service, room service, daily maid service or security for the benefit of Dolphin's Paradise occupants is inconsistent with any intention on the part of the Dunns, or expectation on the part of Haynes-Garrett, that the Dunns maintain possession and control of the premises during the occupancy of the house by Haynes-Garrett and her family. To the contrary, the evidence shows the parties intended for Haynes-Garrett and her family to have "the right of [exclusive] possession and enjoyment of the leased premises" during the term of their occupancy of Dolphin's Paradise. *Isbell*, 273 Va. at 611.

Therefore, the circuit court did not err in ruling that the Dunns only owed a duty of care to Haynes-Garrett commensurate with the duty a landlord owes its tenant.[7]

---

[6] Haynes-Garrett places significance on the use of the term "guests" to refer to occupants of Dolphin's Paradise in the management agreement between the Dunns and Siebert. The management agreement does use terms that are generally associated with an innkeeper, such as "guests," "reservations," and "rates," but it also uses terms that are generally associated with a landlord such as "lease," "contract," "rent," and "rentals." Thus, the use of these terms in the management agreement is, at best, equivocal regarding the status of the occupants of Dolphin's Paradise. In any event, the determination of the relationship between Haynes-Garrett and the Dunns is based on whether they intended for the Dunns to maintain control of the premises during the period of Haynes-Garrett's occupancy.

[7] Both parties direct our attention to the treatment of vacation rental homes by North Carolina. In *Conley v. Emerald Isle Realty, Inc.*, 513 S.E.2d 556, 558 (N.C. 1999), the Supreme Court of North Carolina held that the common law rules governing landlord-tenant relationships applied to short-term vacation rentals. Under North Carolina law, a landlord owes no common law duty to inspect or to maintain the leasehold premises. *Id.* at 559. Subsequent to the decision in *Conley*, the North Carolina General Assembly enacted the North Carolina Vacation Rental Act, N.C. Gen. Stat. § 42A-1 *et seq.* That Act imposes upon lessors of vacation homes the duty to "do whatever is reasonably necessary to put and keep the property in a fit and habitable condition." *Id.* at § 42A-31(2). The Virginia General Assembly has not enacted a statute imposing such a duty upon lessors of vacation homes in Virginia. Thus, as we hold herein, the common law rules governing landlord-tenant relationships apply to the rental of the vacation home at issue here.

11

## IV. CONCLUSION

For the foregoing reasons, we will affirm the judgment of the circuit court.

*Affirmed.*